IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LUCAS GREGORI | * |
| PLAINTIFF, | * |
| v. | * Case No.: 1:16-cv-03853 |
| MARKET STREET MANAGEMENT, LLC | * |
| DEFENDANT. | * |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lucas Gregori ("Plaintiff") seeks to recover unpaid wages, liquidated damages, and reasonable attorney's fees and costs under the Federal Fair Labor Standards Act ("FLSA"), the Maryland Wage Hour Law ("MWHL"), and the Maryland Wage Payment Collection Law ("MWPCL") against his former employer, Market Street Management, LLC d/b/a Family Meal in Frederick, Maryland ("Defendant" or "Family Meal").

Plaintiff was employed by Defendant as a waiter at Defendant's Family Meal restaurant in Frederick, Maryland during the period of about December 2014 through about August 2015. During Plaintiff's period of employ, Defendant failed to pay him at an hourly rate that that meets or exceeds the Federal or Maryland Minimum Wage.[1] Further, Defendant failed to comply with the Federal and Maryland "tip credit" alternative method of minimum wage compliance set forth in the FLSA and the MWHL.  *See* 29 USC 203(m); Maryland Code 3-419.  Consequently,

---

[1] At all times relevant, the Federal Minimum Wage was $7.25 per hour.  For Plaintiff's employment period prior to January 1, 2015, the Maryland Minimum Wage was $7.25 per hour. For the period January 1, 2015, through June 2015, the Maryland Minimum Wage was $8.00 per hour.  For the period July 2015 through August 2015, the Maryland Minimum Wage was $8.25 per hour. *See* Maryland Code, Labor and Employment § 30413(c).

Defendant now owes Plaintiff unpaid wages and statutory liquidated damages under the FLSA, MWHL, and the MWPCL.

Defendant argues it complied with Federal and Maryland "tip credit" requirements and files a Motion for Summary Judgment ("Motion") in support of this position. Defendant's Motion and factual assertions therein are strongly contested. Specifically, Plaintiff herein presents sworn testimony and supporting admissible evidence that (1) Defendant unlawfully permitted impermissible managers in "tip pools" to share tips with Plaintiff and other waiters, bartenders, and bussers; and (2) Defendant failed to pay Plaintiff direct wages for all hours worked at the required "tip credit" direct wage rate. If either of Plaintiff's positions is accepted by the finder of fact, Defendant will not be permitted to claim "tip credit" compliance under Federal or Maryland law. Thus, it is axiomatic that facts material to liability and the ultimate outcome of this case are in direct dispute. Therefore, summary judgment must be denied.

## SUMMARY JUDGMENT LEGAL STANDARD

In reviewing a motion for summary judgment, the Court views the facts in the light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is only proper when the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *Aura Light US Inc. v. LTF Int'l LLC*, 2018 U.S. Dist. LEXIS 44063, *7-9 (D. Md. 2018).

A "material fact" is one that might affect the outcome of a party's case. *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to

return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248.  Here, as elucidated below, genuine disputes exist in the testimonial evidence and between the parties concerning material facts that are central and critical to the outcome of this case.  Accordingly, summary judgment is *per se* inappropriate.

## **GENUINE DISPUTES AS TO MATERIAL FACTS**

In this matter, genuine disputes as to material facts exist directly challenging Defendant's compliance with the statutory requirements fundamental to Defendant's right to use the Federal and Maryland "tip credit" alternative method of minimum wage compliance set forth in the FLSA and the MWHL.  Set forth in this Response and attached herewith is admissible evidence and sworn testimony supporting that:

1. Defendant invalidated the "tip pools" and otherwise failed to comply with the "tip credit" requirements by knowingly and unlawfully allowing and directing shift managers Ms. Reap and Mr. Cross - - with primary job duties and responsibilities that were managerial and not customer focused in nature - - to participate in "tip pools" with Plaintiff and other waiters, bussers, bartenders; and

2. Defendant knowingly and unlawfully allowed or suffered or permitted Plaintiff to work "off-the-clock" hours before and after shifts for which Defendant paid Plaintiff no wages.  The result of Defendant's failing to pay Plaintiff for "off-the-clock" work was that Plaintiff's actual regular hourly rate was less than the required "tip credit" direct wage minimum wage rate.  Consequently, Defendant failed to pay Plaintiff direct wages at the required "tip credit" rate and was not permitted to use the "tip credit."

*See* Interrogatory Responses of Lucas Gregori ("Gregori Interrogatory Responses") attached hereto as Exhibit 1; December 23, 2016, Declaration of Lucas Gregori ("2016 Gregori

Declaration") attached hereto as Exhibit 2; April 6, 2017, Sworn Declaration of William Gouge ("Gouge Declaration") attached hereto as Exhibit 3; April 6, 2017, Sworn Declaration of Lucas Gregori ("2017 Gregori Declaration") attached hereto as Exhibit 4; Resume of Elizabeth Reap ("Reap Resume") attached hereto as Exhibit 5; Deposition testimony of Elizabeth Reap ("Reap Deposition) attached hereto as Exhibit 6; Deposition testimony of Defendant's Corporate Designee Lyndsay Rudolph ("Designee Rudolph Deposition") attached hereto as Exhibit 7; and Deposition of Lucas Gregori ("Gregori Deposition") attached hereto as Exhibit 8.

## ARGUMENT

It is well known to this Court that the FLSA requires employers to pay employees at an hourly rate not less than the Federal Minimum Wage and, for work performed in Maryland, the MWHL requires employers to pay employees at an hourly rate not less than the Maryland Minimum Wage. To this general rule, a narrow exception exists that allows employers to comply with the FLSA and MWHL by paying a lower "tip credit" direct minimum wage rate and crediting, as wages, a statutorily limited amount of tips received by the employee from customers in an amount not exceeding the "credit" selected by the employer. *See* 29 USC 203(m); Maryland Code 3-419.

Congress chose to allow employers a partial tip credit if, but only if, certain conditions are met.[2] *Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319, 1322 (1st Cir. 1992). Congress gave employers of tipped employees a simple choice: either allow employees to keep all the tips that they receive or forgo the tip credit and pay them the full hourly minimum wage. *Chu Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 230 (S.D. N.Y 2002).

If an employer attempts to pay a tipped employee at the "tip credit" rate under the FLSA, the employer must pay those employees a direct hourly wage of at least $2.13 per hour plus a

---

[2] Other than the differing minimum wage rates and allowable "tip credit" amounts (*discussed infra*.) the requirements to be met for employers seeking to claim the "tip credit" are the same under both FLSA and corresponding Maryland law, specifically, Maryland Code Labor & Employment § 3-419 and Md. Code Regs. 09.12.41.19 (2017); *see also McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 245-46 (4th Cir. 2016)

4

"credit" in the maximum amount of $5.12, to equal the minimum wage, which is $7.25 per hour. *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 874 (8th Cir. 2011).; *Ide v. Neighborhood Rest. Partners, LLC*, 2015 U.S. Dist. LEXIS 181149, *12 (N.D. Ga 2015). Nearly identically, if an employer attempts to pay a tipped employee at the "tip credit" rate under the MWHL, the employer must pay employees a direct hourly wage of at least $3.63 per hour plus a "credit" in the maximum amount of the difference between $3.63 per hour and the applicable Maryland Minimum Wage (Prior to 2015 the maximum "tip credit" permitted was $3.62 per hour ($7.25 - $3.63 = $3.62); from January 2015 through June 2015, the maximum "tip credit" permitted was $4.37 ($8.00 - $3.63 = $4.37); and from July 2015 through August 2015, the maximum "tip credit" permitted was $4.62 per hour ($8.25 - $3.63 = $4.62). *See* Maryland Code 3-419; Md. Code Regs. 09.12.41.19 (2017).

Here, Defendant argues it complied with the FLSA and Maryland "tip credit" requirements. In contrast, Plaintiff argues Defendant failed to comply with the FLSA and Maryland "tip credit" requirements and cannot meet its burden to prove compliance.[3] Ultimately, this matter will turn on whether Plaintiff's testimony - - and the testimony of Plaintiff's witnesses is deemed credible or whether Defendant's testimony - - and the testimony of Defendant's witnesses is deemed credible. "Where resolution of an issue of fact depends upon a credibility determination, summary judgment is not appropriate." *Cohen v. Jones*, 2000

---

[3] Because Defendant paid Plaintiff less than the otherwise required Federal or Maryland minimum wage rate, FLSA and Maryland Minimum Wage liability will apply unless Defendant can meet its burden to prove compliance with the "tip credit" requirements. *See Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 230 (5th Cir. 2011) (holding that a restaurant "had the burden to prove it operated a legal tip pool"); *see also Myers v. Copper Cellar Corp.*, 192 F.3d 546, 549 n.4 (6th Cir. 1999) ("[A]n employer who invokes a statutory exemption from minimum wage liability bears the burden of proving its qualification for that exemption."); S. Rep. No. 93-690, at 43 (1974) ("[T]he original intent of Congress [is] to place on the employer the burden of proving . . . the amount of tip credit, if any, which such employer is entitled to claim . . . .").

5

U.S. App. LEXIS 29756, *4 (4th Cir. 2000) (*quoting Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991).  For this reason, summary judgment is inappropriate and must be denied.

    A.    **Defendant's inclusion of Shift Managers Ms. Reap and Mr. Cross in the "Tip Pools" Along with Plaintiff and Other Waiters, Bartenders, and Bussers, was Unlawful and Invalidated the "Tip Pools."**

All parties agree that Defendant included shift managers Ms. Reap and Mr. Cross in the "tip pools." This act was unlawful.  Under the FLSA, and identically under the MWHL,[4] Defendant loses its entitlement to the "tip credit" because it required Plaintiff to share tips with "managers."  *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2nd Cir. 2011) ("[A]n employer loses its entitlement to the tip credit where it requires tipped employees to share tips with (1) employees who do not provide direct customer service ***or (2) managers***.") (emphasis supplied); *Wajcman v. Investment Corp. of Palm Beach*, 2008 U.S. Dist. LEXIS 21939, *3 (S.D. Fla. 2008) ("The theory here is that employees who exercise substantial managerial authority over the day to day operations of the business are functionally the 'employers' themselves").

Ample admissible evidence and testimony is present in this case tending to prove that Ms. Reap and Mr. Cross were true managers that had the authority to and did, in fact, perform primary job duties consistent with management and managerial level employees.  As to Ms.

---

[4] The MWHL itself does not explicitly place any restrictions on tip pooling arrangements. Md. Code Ann., Labor & Employment §3-419(a)(2) ("[T]his section does not prohibit the pooling of tips.") However, "in light of the congruent nature of the FLSA and the MWHL," the District of Maryland reads the FLSA tip pooling requirements into the MWHL. *Gionfriddo v. Jason Zink, LLC*, 769 F.Supp.2d 880, 895 (D. Md. 2011) (*quoting Newell v. Runnels*, 407 Md. 578 (2009)); *Mould v. NJG Food Serv., Inc*., 2014 U.S. Dist. LEXIS 84441, *11-13 (D. Md. 2014) ("Therefore, where an employer implements a tip pooling arrangement that fails to meet the conditions set forth in the FLSA—as Plaintiff has alleged Defendant did here—the employer may not include tips in employees' wages for purposes of compliance with minimum wage requirements.")

Reap and Mr. Cross's actual primary duties and responsibilities, relevant portions of the record are as follows:

* Defendant's Interrogatory 5:  Interrogatory:  Identify the names and job titles of your supervisors or the persons to whom you reported while employed by Defendant during the Relevant Time Period.  Response:  James Vickers, Liz Reap, Lyndsay Rudolph, Josh Cross …

Gregori Interrogatory Responses at Interrogatory 5.

* Response to Interrogatory 12 at xii:   Plaintiff was fired shortly after questioning his wages and how tips were being divided.  The stated reason for the termination was for being late to work, even though Plaintiff's time slip showed Plaintiff was actually a minute early.  Specifically, Liz Reap, in her capacity as Plaintiff's manager, wrote Plaintiff up for being late.  A week later, Mr. Vickers used Liz Reap's write up as the substantial and motivating basis to fire Plaintiff.

Id. at Response to Interrogatory 12.

* Response to Interrogatory 18: … On a regular daily basis, Liz Reap commented and monitored the tips the waiters earned because the more tip money received by the waiters, the more money Liz Reap would directly receive.  In doing so, Liz reap regularly and customarily micromanaged Plaintiff and her other subordinates to ensure top performance and maximizing Liz Reap's personal tip income from the tips received by the actual servers.

Id. at Response to Interrogatory 18.

* Response to Interrogatory 19: The managers that participated in the tip pool [specifically including Ms. Reap and Mr. Cross] were the very same individuals that (1) set schedules; (2) carried out discipline; (3) interviewed employees; (4) trained employees; (5) supervised employees' work performance; (6) directed employees to stay or go depending on how busy the restaurant was; (7) wrote disciplinary reports; including the report(s) by Liz Reap against Plaintiff that directly resulted in his termination; (8) wrote disciplinary reports and fired other employees.  On rare occasions, while acting in the capacity of managers (as opposed to periods when these individuals held different titles such as "opening bartenders") managers such as Liz Reap, Lyndsay Rudolph, and Josh Cross would be forced to interact with a customer and quickly take an order or service a customer.  These acts were not the primary job duties of the managers - - but were performed, as necessary, from time to time to ensure customer satisfaction.  In instances when a manager assisted in performing any duty of a server, the manager would then quickly discipline the server who should have been responsible for customer service for the particular guest or guests the manger attended to.

Id. at Response to Interrogatory 19.

> \*      During [Plaintiff's] employment, Defendant directed Liz Reap, Josh Cross, and other shift managers and bar managers participate and receive money from the tip pools.

2016 Gregori Declaration at 9.

> \*      During [Plaintiff's] employment, Defendant required that [Plaintiff] participate in the tip pool and shared [Plaintiff's] tips with Ms. Reap, Mr. Cross, and other shift managers and bar managers.

Id. at 10.

> \*      At no time during [Plaintiff's] employment was it the primary or substantial job duty of Ms. Reap, Mr. Cross, or any other shift managers or bar managers to directly interact with customers by tacking orders or serving food or drinks to the customers.

Id. at 11.

> \*      During [Plaintiff's] employment, Ms. Reap, Mr. Cross, and other shift managers and bar managers participated substantial in the hiring and firing of servers, bartenders, and bussers.

Id. at 12.

> \*      During [Plaintiff's] employment, Ms. Reap, Mr. Cross, and other shift managers and bar managers participated substantially in deciding and carrying out disciplinary actions against servers, bartenders, and bussers, including write-ups and sending employees home early from shifts.

Id. at 13.

> \*      During [Plaintiff's] employment, Ms. Reap, Mr. Cross, and other shift managers and bar managers participated substantially in training servers, bartenders, and bussers.

Id. at 14.

> \*      During [Plaintiff's] employment, Ms. Reap, Mr. Cross, and other shift managers and bar managers participated substantially in scheduling servers, bartenders, and bussers and were permitted to do so based on their own independent discretion.

Id. at 15.

    \*    During [Plaintiff's] employment, Ms. Reap, Mr. Cross, and other shift managers and bar managers had the full authority to set schedules and send Plaintiff and other servers, bartenders, and bussers home early depending on how busy the restaurant was on any shift.

Id. at 16.

    \*    During [Plaintiff's] employment, Ms. Reap, Mr. Cross, and other shift managers and bar managers devoted a substantial portion of their work time to supervising the job duties of servers, bartenders and bussers to insure the work was performed at the expected level of Defendant's ownership.

Id. at 17.

    \*    At the start of [Plaintiff's] employment, Ms. Reap, individually, along with Mr. Vickers and Ms. Rudolph interviewed [Plaintiff] for the position of server.

Id. at 18.

    \*    At the start of [Plaintiff's] employment, Ms. Reap, individually, trained [Plaintiff] as to the rules, protocols, and procedures for working at the Family Meal restaurant.

Id. at 19.

    \*    During [Plaintiff's] period of employment, Ms. Reap, individually, and in her sole discretion carried out discipline against [Plaintiff] in the work place including at least one formal write-up that directly resulted in the termination of [Plaintiff's] employment.

Id. at 20.

    \*    Ms. Reap, individually, substantially participated in the termination of [Plaintiff's] employment.

Id. at 21.

    \*    During the period of [Plaintiff and Mr. Gouge's] employment, [Plaintiff and Mr. Gouge] have personal knowledge that in weeks that Ms. Rudolph, Mr. Cross, and Ms. Reap, and other managers and shift managers received tips from the tip pools, these individuals did not directly interact with customers by taking orders or serving food or drinks to the customers or perform any service for which [Plaintiff and Mr. Gouge] can assume the customers reasonably expected the gratuity to compensation.

Gouge Declaration at 10; 2017 Gregori Declaration at 10.

> \*       During the period of [Plaintiff and Mr. Gouge's] employment, the managers and management level individuals [specifically including Ms. Reap and Mr. Cross] that Family Meal allowed to participate in the tip pools with [Plaintiff and Mr. Gouge] and other waiters, busboys, runners, and bartenders had primary job duties that included (1) hiring and firing servers, bartenders, and bussers; (2) deciding and carrying out disciplinary actions against servers, bartenders, and bussers; (3) training servers, bartenders, and bussers; (4) scheduling servers, bartenders, and bussers; (5) supervising the job duties of servers, bartenders, and bussers to insure the work was performed at the expected level of Defendant's ownership; (6) ordering and stocking food and drinks; (7) controlling the general day-to-day business operations of the restaurant; and (8) creating and setting the menu and overall presentation of the restaurant.

Gouge Declaration at 11; April 6, 2017, 2017 Gregori Declaration at 11.

> \*       Ms. Reap personally describes her job duties and responsibilities while employed by Defendant as Assistant General Manager, Bar Manager, Shift Manager, and Server Trainer as follows:
>
> [Ms. Reap has] worked in all aspects of front of house jobs for the past five years. As a Server Trainer, [Ms. Reap was] involved in hiring and training of all new employees from day one orientation, to exams, to floor training for numerous team members. While serving as the Bar Manager, [Ms. Reap] maintained inventories of non-alcoholic and alcoholic beverages, reordering and paying invoices as necessary. In [Ms. Reap's] role as Assistant General Manager, [Ms. Reap] was responsible for scheduling staff to ensure proper coverage as well as conducting analysis of year over year sales to properly schedule and reorder stock, as well as projecting and tracking product and labor costs, while staying within budgeted allowances.
>
> Ms. Reap further highlights her duties while employed at Family Meal to include:
>
> [Ms. Reap was] [i]involved in the hiring and training of over 60 new team members 9or staff; [Ms. Reap was] [r]esponsible for daily inventory over 75 beverages (alcoholic and non-alcoholic); [Ms. Reap] [m]aintained a weekly beverage budget; [Ms. Reap] [s]cheduled employee[s] in order to ensure proper coverage of front of house activities each day; and [Ms. Reap] [r]egularly analyzed weekly year-over-year sales and labor costs to make informed scheduling and reordering decisions.

Reap Resume.

> \*       Among Ms. Reap's primary responsibilities as "shift supervisor," Ms. Reap regularly and customarily printed out the floor plans; reviewed the menus for the

      morning, breakfast, and lunch shifts with the chef; opened the bar, and independently selected servers for sections in the restaurant for the shifts.

Reap Deposition pp. 11-13.

    \*    Ms. Reap used her discretion and her independent judgment in selecting servers for specific sections in the restaurant.

Id. at pp. 16-17.

    \*    Among Ms. Reap's primary responsibilities, Ms. Reap was responsible for training new staff including teaching new hires about the food and beverages offered at the restaurant, reviewing restaurant policies and procedures, reviewing the restaurant menu, and reviewing the mission statement of the restaurant.

Id. at pp. 21-22.

    \*    Ms. Reap trained Plaintiff.

Id. at p. 39 ¶¶ 10-11; pp. 41-42.

    \*    In addition to her regular hourly wages, Defendant paid Ms. Reap a weekly salary in the amount of $200.00 per week for extra job duties and responsibilities.

Id. at pp. 43-44; 46.

    \*    Ms. Reap performed ordering, inventory, and carried out ordering of drinks and ancillary items needed and used by Defendant to operate the restaurant.

Id. at pp. 44-46.

    \*    Ms. Reap and Mr. Cross, along with Mr. Vickers, Ms. Rudolph, and the Chef, were the small select group of management level employees that had a key to open and close the restaurant and had authority to access and use the company computer in the manager office.

Id. at pp. 48-49.

    \*    Ms. Reap had the authority to change or amend the schedules for the servers.

Id. at pp. 49-50.

    \*    During the period of Ms. Reap's employment, Ms. Reap was often the most senior front-of-the house employee at the restaurant. In this capacity, Ms. Reap represented Defendant to the customers as the manager on duty and fielded

      customer questions relating to making food and drink modifications and otherwise satisfying customer questions, requests, or complaints.

Id. at pp. 51-53.

* During shifts, Ms. Reap regularly supervised the performance of servers and provided coaching to servers that were not performing at a satisfactory level. These duties were within Ms. Reap's job duties and responsibilities.

Id. at p. 54.

* Ms. Reap assigned side work duties for Mr. Gregori to perform. In Ms. Reap's discretion, Mr. Gregori and other servers could be assigned more desirable or easier side work tasks or less desirable or more difficult or messier tasks.

Id. at pp. 61-63.

* Ms. Reap, along with other managers Mr. Vickers, and Ms. Rudolph, and Mr. Cross, were among the small and limited group that was permitted to handle the cash tip money and each, from time to time, was responsible for entering tip data into Defendant's computer for use by Defendant in the distribution of tips.

Id. at pp. 63-64.

* Ms. Reap and Mr. Cross' opinion and recommendation on disciplinary issues were given deference by top-level management in carrying out discipline on Plaintiff and other employees.

Designee Rudolph Deposition at pp. 40-42.

* Ms. Reap and Mr. Cross had specific job duties and responsibilities to supervise and manage Plaintiff and other bartenders, and bussers, during work shifts.

Id. at p. 42 ¶¶ 5-13.

* Ms. Reap and Mr. Cross had the authority, or at least participated substantially, in making decisions to modify shifts and send waiters home before the end of their shift as was deemed appropriate and necessary based on the busyness of the restaurant.

Id. at pp. 42-44.

* Defendant's chain of command was set up that Plaintiff and other waiters and bartenders were directed and expected to bring complaints and concerns about happenings on their shift to Ms. Reap or Mr. Cross ("the would have gone to [Ms. Reap and Mr. Cross] because somebody didn't fill up the ketchup bottle all the

12

way" ... "Ms. Reap and Mr. Cross" would have handled somebody saying, so and so didn't fold 50 napkins, they only folded 37; [Ms. Reap], we're out of paper towels, like that stuff.")

Id. at 55.

* As part of their job duties and responsibilities, Ms. Reap and Mr. Cross had responsibilities of "running shifts"

Id. at p. 88 ¶¶ 15-19.

* Plaintiff reported to Ms. Reap and Ms. Reap was Plaintiff's direct supervisor. Plaintiff specifically identifies the authority of Ms. Reap and Mr. Cross as, "if any one of those people [specifically including Mr. Cross and Ms. Reap] told you what to do, you did it. You were expected to do it."

Gregori Deposition at p. 24 ¶¶ 11-19.

* Ms. Reap, Mr. Cross, as well as Mr. Vickers, Ms. Rudolph, and Defendant's ownership each had full authority to direct Plaintiff's job duties and assign Plaintiff additional tasks including, but not limited to, leaving the restaurant to perform an errand; go to the grocery store to pick up items; and unloading delivery trucks.

Id. at p. 26 ¶¶ 12-17; pp. 40-41.

* Ms. Reap's job title and duty was that of a manager and her primary work responsibilities included scheduling, collecting tip money, writing people up for disciplinary actions, overseeing the restaurant, opening and closing the restaurant, and performing any related tasks a manager would do in a restaurant. As to Ms. Reap's interaction with customers, Ms. Reap would attend to a table if she was addressing a wrong order or a customer problem. Ms. Reap, however, did not take orders and her job was not to take orders or serve food but, instead, was Ms. Reap's job was to be a manager.

Id. at pp. 72-75.

As the Court well knows and as noted *supra*., at the summary judgment stage, the Court must view and consider all proffered evidence in the light most favorable to Plaintiff, the non-moving party. Through the Court's summary judgment lens, the foregoing sworn deposition testimony, interrogatory responses, witness affidavits, and other admissible evidence must demonstrate that Ms. Reap and Mr. Cross performed, as substantial and primary job duties,

13

managerial responsibilities and acted as Plaintiff's supervisor and direct manager. This finding necessitates the corollary finding that Defendant's inclusion of Ms. Reap and Mr. Cross in "tip pools" was unlawful and invalidated "tip pools," triggering liability under the FLSA and Maryland law. *Miller v. Garibaldi's, Inc.*, 2018 U.S. Dist. LEXIS 55025, *8-9 (S. D. Ga. March 30, 2018) (*quoting*, *Wajcman v. Inv. Corp. of Palm Beach*, 2008 U.S. Dist. LEXIS 21939, *3 n.1 (S.D. Fla. 2008))[5] ("The practice of forced sharing of tips with management is an illegal practice, regardless of whether the members of management are also engaged in services that could be the subject of tipping."); *Beaudry v. Emperor's Gentleman's Club, Inc.*, 2015 U.S. Dist. LEXIS 178020, at *1 (M.D. Fla. 2015) ("The sharing of tips with managers invalidates the tip credit and requires the employer to pay the full minimum wage.")

> **B.** **Because Defendant Failed to Pay Plaintiff for Off-the-Clock Side Work, Defendant Failed to Pay Plaintiff Direct Wages at the Required "Tip Credit" Minimum Wage Rate for All Hours Worked and Therefore Defendant Cannot Utilize the Tip Credit.**

All parties agree that Defendant paid Plaintiff at the rate of $3.63 per hour for "on-the-clock" work. In addition to "on-the-clock" duties, Defendant directed Plaintiff to perform side work duties and required Plaintiff to be engaged to be waiting to perform duties "off-the-clock" before and/or after shifts (e.g. it was mandatory that Plaintiff arrived at the restaurant 15 minutes before his shift). Defendant paid Plaintiff no wages for "off-the-clock" compensable job duties.

---

[5] In *Wajcman*, poker dealers brought claims under the FLSA alleging that casino floor supervisors were inappropriately included in a tip pool. *Wajcman*, 2008 U.S. Dist. LEXIS 21939, at *1-2. In *Wajcman* the Court noted that while positions such as floor supervisors involve significant consumer interaction, they are not in a position involving the "exchange of pleasantries or provision of personal services that ordinarily evokes tipping generosity." *Id*. Thus, the Court refocused the inquiry, indicating that it looked to both the "quantity and quality of the customer interaction." *Id*. Ultimately, the Court found that the defendant had failed to show that there was no genuine issue of material fact because there were disputed issues pertaining to the quality and quantity of supervisor-customer interaction. 2008 U.S. Dist. LEXIS 21939, at *4-5.

As a result, when all compensable weekly work hours are counted, Plaintiff's actual direct wage regular hourly rate was less than the required "tip credit" direct wage rate.[6] Therefore, Defendant cannot avail itself of the tip credit. *See Romero v. Top-Tier Colorado LLC*, 849 F.3d 1281 (10th Cir. 2017).

For Defendant to comply with the "tip credit"[7] and count Plaintiff's tips towards compliance with its minimum wage obligations, Defendant was first required to pay Plaintiff a direct wage at an hourly rate not less than the required direct wage minimum; the higher of $2.13 per hour or $3.63. *See* 29 U.S.C. § 203(m); Maryland Code 3-419; *Marlow v. New Food Guy, Inc.*, 861 F.3d 1157,1160 (10th Cir. 2017); *Doty v. Elias*, 733 F.2d 720, 722-24 (10th Cir. 1984) (The employer did not pay the tipped employees an hourly wage or salary but allowed them to keep all the tips they received. The employer argued that it complied with the FLSA because the amount of the tips exceeded the minimum wage. The Court rejected the employer's argument stating that § 203(m) "ensure[s] that an employer may not use the tips of a tipped employee to satisfy more than a specified percentage of the Act's minimum hourly wage.").

The record before the Court evinces clear factual support that Defendant failed to pay Plaintiff direct wages at the required rate for all hours worked. Specifically, Plaintiff regularly and customarily performed and was directed or suffered or permitted to perform "off-the-clock"

---

[6] If Plaintiff worked four (4) shifts of six (6) hours a piece, Plaintiff worked "on the clock" for twenty-four (24) hours. If, for each shift, Plaintiff worked fifteen (15) minutes per shift performing "off-the-clock" duties or was otherwise engaged to be waiting at Defendant's direction, Plaintiff performed, in that same week, one (1) hour of uncompensated "off-the-clock." Thus, Plaintiff worked a total of twenty-five (25) total compensable work hours. Consequently, Plaintiff's actual direct wage rate was $3.48 per hour (($3.63 per hour * 24 on-the-clock-hours = $87.12) / 25 total compensable hours worked = $3.48 per hour). This rate is and was less than the required "tip credit" direct wage required hourly rate ($3.63 per hour).

[7] Prior to 2015, the maximum credit was $3.62 per hour; from January 2015 – June 2015, the maximum credit was $4.37 per hour; from July 2015 through August 2015, the maximum credit was $4.62 per hour.

uncompensated hours or was otherwise engaged to be waiting for the benefit of Defendant for about one (1) to two (2) hours per week. Relevant excerpts from the record strengthening and proving this allegation are as follows:

> \*  Plaintiff's Response to Defendant's Interrogatory 3: On about a weekly basis, Defendant required Plaintiff to finish his work after his time to clock out. Thus, Plaintiff performed between 30 minutes to 1 hour a week off the clock for which he received no wages. The net result of this is that when Plaintiff's weekly direct wages are divided by Plaintiff's hours, his direct wage hourly rate was less than $3.63 per hour. Consequently, Defendant cannot otherwise comply with the Maryland tip credit because Defendant did not pay Plaintiff the required "tip credit" rate for all hours Plaintiff worked (e.g. Plaintiff was paid $3.63 per hour \* 30 hours = $108.90 in a week; Plaintiff actually worked 31 compensable hours (including one off-the-clock-hour). Thus, Plaintiff's regular rate is $108.90 / 31 = $3.51 per hour; a rate less than the required Maryland "tip credit" direct wage rate.

*See* Gregori Interrogatory Responses at Response to Interrogatory 3; *see also* deposition testimony by Plaintiff affirming Plaintiff's off the clock hours and expanding upon Plaintiff's Interrogatory Responses in Gregori Deposition at pp. 163-170.

> \*  It was Defendant's rule that Plaintiff was required to be at his shift 15 minutes before Plaintiff's shift started.

*See* Reap Deposition at p. 58.

> \*  Plaintiff was required to arrive at work 15 minutes before his shift started. Plaintiff was not permitted to wear his work uniform to work and was not permitted to wear his work uniform out of the restaurant when leaving. The work uniform was required to perform work duties for Defendant. Plaintiff was not "on-the-clock" when changing into his work uniform and was not "on-the-clock" when changing out of his work uniform. Defendant paid Plaintiff no wages for changing in or out of his work uniform.

*See* Designee Rudolph Deposition at pp. 142-148.

> \*  In instances Plaintiff worked more than forty (40) on-the-clock hours in a week, Defendant paid Plaintiff at the rate of $5.45 per hour ($3.63 \* 1.5 = $5.45) for overtime hours worked over forty (40) per week.

Id. at 150-151.[8]

---

[8] Defendant's payment to Plaintiff at the direct wage rate of $5.45 for overtime hours Plaintiff worked over forty (40) per week is an admitted *per se* FLSA and Maryland overtime wage

16

Defendant's FLSA and MWHL minimum wage and "tip credit" violation is plain and unmistakable through simple arithmetic.  Plaintiff's actual direct wage rate (e.g. $3.48 per hour) plus Defendant's maximum statutorily permitted "tip credit" (e.g. $3.63 per hour) does not and cannot add up to the required minimum wage rate ($3.48 "direct wage rate" + $3.63 per hour "credit" = $7.11; $7.11 is less than $7.25, the Federal Minimum Wage and the Maryland Minimum Wage).  Therefore, (1) Defendant did not pay Plaintiff minimum wage compensation as required by the FLSA and Maryland law and (2) Defendant did not pay Plaintiff the direct wage rate that would permit Defendant to avail itself of the "tip credit."

Because Defendant failed to pay Plaintiff the required minimum wage and Defendant failed to pay Plaintiff the direct wage rate that would permit use of the "tip credit," Defendant is not permitted to use tips Plaintiff received from customers to mitigate FLSA or Maryland wage and hour obligations or liability.  *See Romero v. Top-Tier Colo. LLC*, 849 F.3d 1281 (10th Cir. 2017) ("[W]hile an employer can treat tips as wages under certain circumstances," *id.*, an employer absolutely cannot credit itself with tips exceeding the statutorily allowable "tip credit."); *see also Hart v. Barbeque Integrated, Inc.*, 2017 U.S. Dist. LEXIS 176755, *6-7 (D.S.C. 2017).  Consequently, Defendant now owes Plaintiff wages equal to the difference between Plaintiff's actual regular hourly rate (e.g. $3.48 per hour) and the higher of the Federal or Maryland Minimum Wage for all hours worked.  As such, summary judgment plainly must

---

violation. The "tip credit" is a credit against the obligatory applicable minimum wage. When Plaintiff worked overtime more than forty (40) hours per week, Defendant was required to pay 1.5 times the applicable minimum wage and then, from that amount, subtract the "credit." As such, overtime should have been paid to Plaintiff at the following overtime premium rates: (prior to January 2015 $7.26 ($10.88 - $3.62 "credit" = $7.26); January 2015 – June 2015 $7.63 ($12.00 – $4.37 "credit" = $7.63); and July 2015 – August 2015 $7.76 ($12.38 - $4.62 "credit" = $7.76).

be denied because Defendant will, in fact, be liable to Plaintiff for unpaid wages and statutory damages under the FLSA, MWHL, and MWPCL.

## CONCLUSION

Here, liability will turn squarely on whether a fact finder is persuaded by Plaintiff's factual presentation or Defendant's factual presentation. Accordingly, this case cannot properly be decided on summary judgment but, instead, must be decided by a finder of fact listening to all the testimony and making a factual determination as to which witnesses the fact finder deems credible. *Anderson*., 477 U.S. at 259 ("Credibility determinations, the weighing of evidence, and the choosing of inferences from the facts are functions of the jury"); *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) ("It is not our job to weigh the evidence . . . or to disregard stories that seem hard to believe. Those tasks are for the jury") *see also Howard v. Second Chance Jai Alai LLC*, 2016 U.S. Dist. LEXIS 78538, at *6-9 (M.D. Fla. 2016) (denying the defendant's motion for summary judgment because there were genuine issues of material fact as to whether certain employees had enough interaction with customers to properly share in the tip pool). For this reason, Defendant's Motion must be denied.

Respectfully submitted,

\_\_\_\_/s/ Gregg C. Greenberg_____
Gregg C. Greenberg, Bar No. 17291
Zipin, Amster & Greenberg, LLC
8757 Georgia Avenue, Suite 400
Silver Spring, Maryland 20910
Phone:  (301) 587-9373
Email: ggreenberg@zagfirm.com

*Counsel for Plaintiff*